HARTWIG *v.* KELL.

1. TRIAL—INSTRUCTIONS—FAILURE TO REQUEST.

It is the duty of counsel to proffer desired fuller or more specific instructions, especially where they are asked by the court if there are any changes they desire to have made, or anything further that they desire instructions to be given on.

2. RAPE—DAMAGES—EXCESSIVE VERDICT.
  A verdict for $2,500 for an indecent assault on a fifteen-
    year-old girl *held*, not excessive.

Error to Dickinson; Flanigan, J.  Submitted October 9, 1917.  (Docket No. 59.)  Decided December 28, 1917.

Case by Bertha Hartwig, an infant, by her next friend, against Milton Kell for a criminal assault. Judgment for plaintiff.  Defendant brings error.  Affirmed.

*H. J. Rushton* (*P. H. Martin*, of counsel), for appellant.

*Michael J. Doyle*, for appellee.

MOORE, J.  From a verdict and judgment in favor of the plaintiff for $2,500, the case is brought here by writ of error.

We quote, for the purpose of showing what the litigation is about, from the opinion of the trial judge when he overruled the motion for a new trial:

"The declaration in separate counts charges Kell with having made an indecent assault on the plaintiff, and with having induced, aided, and abetted a similar assault made by one Arthur Le Boeuf. As far as necessary to recount it in disposing of the questions presented by the motion for a new trial, the story, which the jury were fully warranted by the evidence in believing, follows: At the time of the alleged assaults, October 18, 1914, the age of the plaintiff was about 15 years and 8 months. She was a school girl residing with her family at the little village of Powers, in Menominee county, where she was born and lived all her life. The defendant Kell was then about 35 years old, married, and for many years a successful hardware merchant and livery stable keeper at Powers. The plaintiff made purchases at his store from time to time. Other than such as so resulted, she had no 'acquaintance with him particularly.' Ar-

thur Le Boeuf, 21 years old and unmarried, was also born and lived practically all his life at Powers. The plaintiff and Le Boeuf were acquainted, and as they grew up met occasionally at the homes of neighbors and around, as children in a small community do, but their acquaintance was not intimate. Le Boeuf was employed by Kell 'off and on' in the livery business and as chauffeur. While so employed, Kell, intimating that the plaintiff could be persuaded to submit to sexual intercourse, asked Le Boeuf 'to try and get her out' for that purpose. During the afternoon of October 18, 1914, which was Sunday, the plaintiff, not by appointment but as it happened, met Le Boeuf at the home of a neighbor, where she had gone to visit with a school girl companion. Upon leaving the neighbor's house about 5:30 in the afternoon, Le Boeuf invited the plaintiff to take an automobile ride with him that night. She evidenced disinclination, and as he testified, realizing she would not otherwise go, he told her he was to take a Mrs. Labre from Spalding to Hermansville, six miles distant, and a Miss Radford from Hermansville to Powers.

"Powers and Spalding, also a small village, while separated about a mile, are connected by sidewalk. The plaintiff knew of Mrs. Labre and where she lived at Spalding. She also knew of Miss Radford, a daughter of the superintendent of the Wisconsin Land & Lumber Company. Being assured of the company both ways of ladies of the highest respectability, she consented to go, whereupon, according to Le Boeuf, the sidewalk in front of Prince's store and 7:15 p. m. was arranged as the place and time of meeting. * * * Upon learning from Le Boeuf the conditions under which the plaintiff consented to the ride, Kell 'thought around for awhile and said all right.' Kell's automobile was two-seated. Le Boeuf took the driver's seat. Kell occupied the back seat while the car was going out of the barn around the corner. The corner passed, Kell dropped to the floor of the tonneau, and, as Le Boeuf testified, covered himself with a robe. Le Boeuf drove to the appointed meeting place. * * * He led her to the automobile. It was not dark. Before they entered the car, he threw a robe which was resting on the front seat over Kell, who remained hidden

on the floor of the tonneau. If Kell had not previously
covered himself with a robe as Le Boeuf insists he
had, that he was now covered with a robe he admits.
*   *   *   The regular automobile road from Powers
to Hermansville runs through Spalding. Noticing as
they were passing through Spalding that the car was
not going towards the Labre residence, the plaintiff
asked Le Boeuf whether he was not taking Mrs. Labre
to Hermansville. He answered, 'No,' but that instead
he was going to take one George Grau to Hermans-
ville. *   *   *   Going but a very short distance after
assuring the plaintiff he was on a 'short cut' to Grau's
place, Le Boeuf stopped the car pretending something
was wrong with it. He turned off the lights. It was
a dark night. They were on a lonely byroad about a
quarter of a mile from the nearest habitation. He
asked her to step out of the car to enable him to get
tools he said were under the cushion. She insisted
having put out the lights without tools he could put
them on without the tools. He insisted it was neces-
sary for him to get the tools and for her to leave the
car to allow him to do so. She became suspicious and
alarmed and refused to leave the car. He took hold
of her in an effort to pull her out. She resisted 'as
strong as she could.' She grasped and hung on the
steering wheel. He endeavored to put his hand under
her clothing and succeeded to the extent of tearing
her stocking. How long the struggle continued she
does not remember. He finally forced her out of the
car. He held her by the hand so she could not run.
She continued her struggle on the ground. He tripped
her down, held her, as he said, 'so she couldn't make
much fuss,' and accomplished his object. Upon get-
ting up from the ground after Le Boeuf released her,
she saw Kell 'rising up from the back seat.' He said:
'Now, Bertha, what have you done? Do you want
me to tell your mother?' As he spoke, he was alight-
ing from the car bringing the robe with him. She
answered, 'No.' As he came forward, she asked him
'to leave her alone.' He answered if she 'didn't do
it with him he would tell her mother.' He put the
robe down on the ground. 'He wanted her to go back
on the robe.' He took hold of her. She struggled
with him. He led her over to the robe. She sank to

her knees, and then to a sitting posture, because, as she says, she had no strength left to stand. He then, because she had no strength left to fight against him, had sexual intercourse with her.

"In practically all which she claimed was said and done from the time they met in the afternoon until the assaults were completed, the plaintiff is corroborated by Le Boeuf. He further testified that when he took the plaintiff out he felt he would have difficulty in obtaining her consent to intercourse, and that his intention was to rape her if he couldn't get it any other way. To the question 'Did Milton Kell tell you to force this girl?' he answered: 'Yes, sir; he told me not to let her get away.' He admitted he lied to her to get her to go on the trip; that he lied to induce her to leave the car; that he overcame her resistance and pulled her from the car, tripped her down, held her so she could not move, and accomplished his purpose. He further testified that when Kell spoke of telling her mother she started to cry and to walk towards home; that Kell followed, took her by the arm, brought her back, and told him to go away; that he went to the other side of and three or four feet from the car, and lay down where he could see under the car; that he saw 'black objects' in motion, but it was too dark to see 'what was going on.'

"Kell, who was sworn as a witness on his own behalf, denies proposing to Le Boeuf that he take the plaintiff on the Christenson road or elsewhere, in a buggy or automobile, that he (Kell) might have intercourse with her. He admitted that with full knowledge of Le Boeuf's indecent and criminal purpose, he not only loaned him his automobile as an aid in its accomplishment, but went along to see it done. He further admitted he secreted himself in the car so she would not know of his presence, and that he knew what Le Boeuf was doing with the girl and did not interfere. He claimed she left the car voluntarily and voluntarily submitted to intercourse with Le Boeuf. He denied having sexual intercourse with her, although Fred Haggerson, prosecuting attorney of Menominee county, testified that soon after the affair became publicly known Kell admitted to him he attempted to have intercourse with the girl, and failed only

because nature, at the moment, denied him the necessary aid."

We quote from the charge to the jury:

"The claim of the plaintiff is that she was assaulted and ravished, first by Le Boeuf, and that Le Boeuf was counseled, aided, and abetted in the making of the assault by defendant, Kell.

"If Le Boeuf made an assault on the plaintiff, and in the making of the assault he was counseled thereto, encouraged therein, and aided therein by the defendant, Kell, the plaintiff would have a right of action for any damages which resulted from such assault, against both Le Boeuf and Kell, or either one of them. So you will understand the law of this case to be, if you find from the evidence here that Le Boeuf committed an assault and battery upon the plaintiff, and that he was advised, encouraged, and aided by Kell, and that Kell was present at the time when that assault was made, then Kell is liable to the plaintiff for the damages which resulted to her by reason of that assault, although the actual assault was made by Le Boeuf.

"Now the contrary is true; if Le Boeuf made an assault on the girl and committed a battery upon her person without being counseled thereto by Kell, and without being aided or encouraged therein by Kell, then Kell would not be liable for any damages resulting from the assault made by Le Boeuf. If Kell himself committed an assault and battery on the girl, then he is liable to answer to her in this action for all damages which resulted to her from that assault and battery.

"Now, gentlemen, what are the claims of the parties? The plaintiff claims that she was invited to take an automobile ride by Le Boeuf; that she went with him in the automobile; that the automobile was owned by defendant, Kell; that Kell was concealed in the bottom of the tonneau of the automobile; that after the automobile had reached a certain point, which has been described to you, it was stopped; that by force and violence, and against her will, she was removed from the machine by Le Boeuf; that after being removed from the machine that then, by force and vio-

lence and against her will, Le Boeuf had sexual intercourse with her; and that, after Le Boeuf had committed that act, the defendant, Kell, by force against her will had sexual knowledge of her body.

"The defendant admits he owned the automobile. He admits he was concealed in the bottom of the tonneau. He admits he knew that Le Boeuf had invited the girl out with the intention of having sexual intercourse with her. But he denies that he knew that Le Boeuf intended to force her, and denies that he himself assaulted her or had sexual intercourse with her.

"These are the claims of these parties in substance, it will be for you to say from the testimony in the case what is the truth about this matter. What is the truth about it? Did Le Boeuf by force and violence and against her will have carnal knowledge of her body on that occasion? Yes or no, from the testimony in this case. That will be for you to say, gentlemen. If he did not, the defendant cannot be charged with any damages on account of anything that Le Boeuf did. But if he did, then the next question is: Did the defendant, Kell, advise, encourage, and aid in the commission of the act? If he did, then, as I have said to you, he is obliged here and now to answer to the plaintiff for all damages which that act occasioned to her, although the act itself was committed by Le Boeuf.

"Now, gentlemen, passing from the alleged act of Le Boeuf, the next question is whether or not the defendant, Kell, himself assaulted the girl, and against her consent had carnal knowledge of her body. Is that true, or is it not true? That will be for you gentlemen to say from the testimony in the case. If it is true the defendant, Kell, committed an assault on the girl, and by force and against her will had sexual knowledge of her body, then, gentlemen, he must answer for all damages which you say was occasioned to her by that act.

"If, however, it appears in this case that the plaintiff had sexual intercourse with Le Boeuf willingly, then, as I have already said, no damages can be allowed her because of the assault committed by Le Boeuf. It is also true that if, willingly and with her

199—Mich.—39.

consent, she indulged in an act of intercourse with the defendant, Kell, she will be entitled to no damages on account of that. act.

"Now, gentlemen of the jury, what is the truth about this whole matter? That will be for you to say from the testimony in the case, and from nothing else. If the plaintiff is entitled to recover any damages, then you will consider the amount of damages."

The court then devoted more than three printed pages of the record to the question of damages.

Near the close of the charge, the record shows as follows:

"The court here called upon the attorneys for both sides, and asked them if there was anything further that they desired the jury to be instructed on, or if there were any changes to be made.

"Counsel for the defendant asked the court to instruct the jury that the acquittal of the defendant on the criminal charge of rape at Menominee (which fact had been introduced in the case by the defendant and referred to by both sides in their argument) should not influence the verdict either way.

"Neither counsel for the defendant nor counsel for the plaintiff offered any criticism of the charge as given, or suggested or requested any modification or correction thereof. The court instructed the jury in accordance with defendant's verbal request as follows: 'You are not to let the fact that defendant was acquitted of the criminal charge of rape at Menominee influence your verdict in either way.'"

Counsel for defendant did not prefer any written request to charge.

Various assignments of error are argued at length. The most important ones are that the court erred in various portions of his charge to the jury upon the question of damages. Counsel quote at length from the charge of the court, and then say (we quote from the brief):

"It is true, as appears above, that the court charged: 'She would be entitled to such damages as will fully

and fairly compensate her for all injury to her body, actual injury, etc. * * * And, in addition to that, she will be entitled to all such damages as will in your judgment fully and fairly compensate her for the injury to her feelings,' etc.

"But this is far from being a cure. The court does not say that she is entitled to *only* such damages. Indeed, there is not here the slightest intimation that this was intended as a limitation upon any or all that had been theretofore said about damages. A lawyer familiar with the law might so infer. It was not intended as a cure of anything theretofore or thereafter said on the subject of damages. It was, instead, one of several erroneous yard sticks handed the jury, whereby to measure defendant's liability. How many different standards of measure did the jurors invoke, and, if but one, which one?"

The trial judge attempted to cover the question of damages fully. In his anxiety to do so, he appealed to counsel, as already appears. Evidently they thought he had fully covered that subject, for they made no suggestion that he should tell the jury that plaintiff could recover only such damages as had been mentioned.

The trial judge was quite right in saying, when overruling the motion for a new trial:

"If more full or specific instructions upon any particular point was desired, it was the duty of the defendant to frame and present a special request covering the point. 'Omitting or neglecting to do so, he will be deemed satisfied with the sufficiency of the instructions as given, and an exception based upon the want of sufficiency cannot be assigned as error.' *Walters* v. *Railway*, 183 Mich. 549 (149 N. W. 1004, Am. & Eng. Ann. Cas. 1916B, 382) ; *Barton* v. *Gray*, 57 Mich. 622 (24 N. W. 638) ; *Barnett* v. *Insurance Co.*, 115 Mich. 247 (73 N. W. 372) ; *Spray* v. *Ayotte*, 161 Mich. 593 (126 N. W. 630) ; *Lewis* v. *Brick Co.*, 164 Mich. 489 (129 N. W. 726). 'Parties cannot remain silent, and thereby lie in wait to ground error, after the trial is over, upon a neglect of the court to instruct the jury as to something which was not called to its

attention on the trial, especially in civil cases.' *Kinney* v. *Folkerts*, 84 Mich. 616 (48 N. W. 283) ; *Hewitt* v. *Lumber Co.*, 136 Mich. 110 (98 N. W. 992)."

It is claimed the verdict is excessive, and counsel argue at length that the girl was not virtuous, and the inference is sought to be drawn that she did not resist as much as she ought, and that she was probably willing to have intercourse with Le Boeuf. Her admission does disclose that upon one occasion before this occurrence she had intercourse with a schoolmate, but there is nothing to indicate that she was a depraved girl; but, even though she had upon this one occasion lapsed from virtue, this gave defendant no right to do what the evidence discloses he did do.

The argument was pressed home upon the jury, and it involved a question peculiarly within their province.

The case is an unsavory one. The testimony of the defendant indicates that he is thoroughly depraved. We are not at all surprised that the jury believed the testimony of the girl and of Le Boeuf instead of believing the defendant. If their stories are true, the verdict is not excessive. We do not feel called upon to go into details in this opinion. We content ourselves with saying that, after listening to the able oral argument of counsel for appellant and reading the records and briefs with great care, we reach the conclusion that there was no reversible error.

The judgment is affirmed, with costs to the plaintiff.

KUHN, C. J., and STONE, OSTRANDER, BIRD, STEERE, BROOKE, and FELLOWS, JJ., concurred.